724 F.2d 727
 Fed. Sec. L. Rep. P 99,585
GAF CORPORATION, Plaintiff-Appellee,
v.
Samuel J. HEYMAN, Daniel T. Carroll, Robert C. Wilson,
Sanford Kaplan, Jacob E. Goldman, William P. Lyons, Scott A.
Rogers, Jr., Edward E. Shea, William Spier, Joseph D.
Tydings, individually and as members of the GAF
Shareholders' Committee for New Management, H.J. Heyman
Sons, Inc., Heyman Associates # 1, Heyman Joint Venture, the
Gateway Company, General Realty Improvement Company, H.J.
Heyman Realty Corp., Temple, Inc. and Annette Heyman,
Defendants- Appellants.
 No. 1701, Docket 83-7468.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 11, 1983.
Decided Dec. 8, 1983.
 
 Jerome G. Shapiro, New York City (George A. Davidson, Theodore V.H. Mayer, Hughes, Hubbard & Reed, New York City, of counsel), for plaintiff-appellee.
 Arthur L. Liman, New York City (Max Gitter, William P. Farley, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Harvey J. Goldschmid, P.C., New York City; Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, New York City, of counsel), for defendants-appellants.
 Before VAN GRAAFEILAND and PRATT, Circuit Judges, and HOLDEN, District Judge.*
 GEORGE C. PRATT, Circuit Judge:
 
 
 1
 This is an expedited appeal from a judgment of the United States District Court for the Southern District of New York (Lloyd F. MacMahon, Judge ), entered after a bitter proxy contest in which shareholders of plaintiff GAF Corporation voted decisively to replace the corporation's incumbent board of directors with an insurgent slate headed by defendant Samuel J. Heyman. The district court ruled that the insurgents violated Sec. 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78n(a) (1982), and Rule 14a-9(a) thereunder, 17 C.F.R. Sec. 240.14a-9(a) (1983), by failing to disclose in their proxy materials any information concerning an action for breach of trust, brought by Heyman's sister against him and his mother a year before the 1983 campaign began, which GAF alleged cast doubt on Heyman's fitness to serve as a director. Although this family dispute among the Heymans did not involve GAF, the district court enjoined the entire insurgent slate from assuming the directorships to which they had been elected, set a new record date, and ordered a resolicitation of proxies and a new election. For the reasons below, we hold that non-disclosure of the Heyman family lawsuit was not a material omission in the context of this proxy contest. Accordingly, we reverse.
 
 I. BACKGROUND
 
 2
 As will be apparent from the following recitation, this appeal arises out of a unique set of circumstances. Because our resolution of the central issue on appeal--the materiality of the Heyman family lawsuit--is tied so closely to the specific facts before us, we find it necessary to recount them in great detail.
 
 A. The Parties
 
 3
 GAF is a Delaware corporation primarily engaged in the manufacture of specialty chemicals and building materials. Its stock is publicly traded on the New York Stock Exchange. As of March 9, 1983, the record date for the election of directors at the 1983 annual meeting, GAF had 45,000 shareholders, with 14,333,750 shares of common and 2,478,062 shares of convertible preferred stock outstanding. Roughly 40 percent of these shares were controlled by institutional investors.
 
 
 4
 Since its initial public offering in 1965, GAF's chairman of the board and chief executive officer has been Dr. Jesse Werner, a chemist by trade, who headed the slate of incumbent director-nominees seeking re-election in 1983. Management's remaining nine nominees had served on the GAF board for periods ranging from two to thirteen years. As a group, GAF's incumbent directors and officers controlled approximately 3.8 percent of the corporation's common stock.
 
 
 5
 Werner's counterpart in the insurgent camp was Samuel J. Heyman, a Connecticut businessman. During 1982 and 1983 Heyman organized, financed, and was the principal spokesman for "The GAF Shareholders' Committee for New Management" (the Committee). The Committee's slate of nominees included a number of businessmen and a former United States Senator, all of whom were handpicked by Heyman. As of the record date, Heyman, who owned no GAF stock prior to 1981, controlled approximately 4.72 percent of the corporation's common stock. Together, the insurgent slate controlled roughly 5.5 percent of all outstanding shares.
 
 
 6
 B. The Events of 1982: Threatened Contest, Settlement Agreement, and Litigation Fallout
 
 
 7
 Heyman first attempted to influence GAF's policies in January 1982, when he proposed that the corporation either be liquidated or buy back a significant percentage of its outstanding stock. Werner dismissed both alternatives as not "practically feasible".
 
 
 8
 In February and March, Heyman stepped up the pressure on management by preparing for a proxy contest at the 1982 annual meeting, scheduled for April. However, when Werner informed Heyman that GAF had received overtures from several corporations concerning a merger of the entire corporation or a sale of the building materials business, GAF and Heyman entered into a written settlement agreement under which Heyman agreed to forego any challenge at the 1982 annual meeting in exchange for management's commitment to pursue these transactions. GAF also agreed to reimburse Heyman for $250,000 in expenses he claimed to have incurred. On March 22, GAF announced in a press release, without disclosing the settlement that had been reached the night before, that it was entertaining proposals from three corporations regarding merger or sale transactions with a "view toward maximizing near-term benefits to [GAF] shareholders".
 
 
 9
 While the settlement agreement established a temporary truce, it ultimately created more problems than it resolved. Depending on which side is believed, GAF was either unwilling or unable to consummate any of the transactions contemplated by the agreement. On September 22, GAF formally renewed hostilities by suing Heyman in the District Court for the Southern District of New York claiming misrepresentation and breach of contract because Heyman had incurred less than $250,000 in expenses in connection with his threatened proxy contest. GAF sought to recover the shortfall.
 
 
 10
 On November 10, Heyman struck back in the same court with an individual and stockholders' derivative action against GAF and its board. His complaint alleged, among other things, that the board had made false representations concerning potential merger and sale negotiations in order to induce the Committee to withdraw its plan to wage a proxy contest in 1982, and continued to make such false representations in later progress reports to shareholders, with the objective of inducing shareholders to vote for management at the 1983 annual meeting. Both of these actions are pending.
 
 C. The 1983 Campaign
 
 11
 Having been unable to influence the corporation's policies in 1982, Heyman decided to escalate his efforts in 1983. On January 27, he served a demand on GAF to inspect and copy a current list of shareholders under Del.Code Ann. tit. 8, Sec. 220 (1974 & Supp.1982). When management refused, Heyman secured an order in the Delaware Chancery Court on February 16 requiring GAF to comply with his demand.
 
 
 12
 Before this order was issued, Heyman and his counsel met with Werner and counsel to the board in a final attempt to avoid what promised to be a costly and disruptive proxy war. At this meeting, Heyman reportedly offered to withdraw his challenge if Werner would resign. Not surprisingly, his offer was rejected, thus clearing the stage for the 1983 campaign.
 
 
 13
 The proxy contest was fiercely fought on several fronts. In addition to sending proxy materials directly to shareholders, both sides placed advertisements in the New York Times and the Wall Street Journal. The "total mix" of information available at the time of the election also included the many news stories that the closely watched contest had generated.
 
 
 14
 In the early stages of the contest, the insurgent Committee hammered away at two central themes. First, the Committee challenged the Werner management's 18-year record at GAF. Specifically, the Committee emphasized that:
 
 
 15
 (1) GAF common shares had lost more than 80 percent of their market value (adjusted for inflation);(2) Dividends on GAF's common stock had recently been slashed by 75 percent to an all-time low;
 
 
 16
 (3) GAF had reported an average net income of less than $.22 per share annually, and the book value of its common stock had dropped from $14.97 per share to $4.58 per share;
 
 
 17
 (4) GAF had reported an aggregate operating loss of more than $46,000,000 in 1981 and 1982;
 
 
 18
 (5) Werner had pursued a program of random and haphazard acquisitions that cost the corporation hundreds of millions of dollars;
 
 
 19
 (6) Werner's record for executive turnover featured the termination of three successive GAF presidents in a two-year period; and
 
 
 20
 (7) Despite all of the foregoing, Werner had been "rewarded" with increasingly excessive compensation packages.
 
 
 21
 The Committee underscored these points by selectively quoting excerpts from the financial press that were sharply critical of GAF, in general, and Werner, in particular. For example, Forbes Magazine had described GAF as having "one of the worst corporate performance records in American industry." Similarly, Adweek had ranked Werner as one of the seven "most overpaid people in America."
 
 
 22
 The second theme in the platform unveiled by the Committee was its program to realize GAF's underlying values for its shareholders. The Committee advocated retention of GAF's building products division, at least until conditions in the housing market improved, and an immediate sale of the corporation's chemical business and classical radio station. After retirement of the corporation's long-term debt, the Committee's program envisioned a substantial distribution of the remaining cash proceeds to shareholders. Among the proxy materials circulated in support of this program were favorable opinion letters from the Committee's investment banker, Prudential-Bache, and its accounting firm, Arthur Andersen & Co.
 
 
 23
 Responding to the issues raised by the Committee, the incumbents defended their performance, criticized the Committee's program, and proposed an alternative program. With respect to their own financial record, they questioned the selected statistics, convenient years, and self-serving definitions relied on by the Committee. Further, the incumbents emphasized that the market price of GAF stock had soared recently.
 
 
 24
 As to the Committee's program, the incumbents initially opposed a sale of the chemical business and instead advocated disposition of the building products division. According to the incumbents, the Committee's plan to sell off the chemical division, retire the corporation's long-term debt, and distribute the remaining proceeds to shareholders was based on an unrealistic estimate of the market value of that division. They also argued that it would not be advisable to eliminate the reliable and highly profitable chemical business and become totally dependent on the cyclical building materials business. To buttress their position, the incumbents circulated an opinion letter from GAF's investment banker, Morgan Stanley & Co., which proclaimed that "the GAF Plan is superior".
 
 
 25
 While both sides' proxy materials focused primarily on these economic issues, the campaign was not without its share of personal attacks. For openers, each side repeatedly accused the other of bad faith in connection with the 1982 settlement. Beyond this, the Committee asserted that Robert Spitzer, one of GAF's outside directors, had testified under immunity in a 1979 federal prosecution that he had made illegal cash payoffs to a union official in return for labor concessions for Treadwell Corporation. The Committee also charged that Werner, a classical music enthusiast, had acquired GAF's unprofitable radio station to indulge his own personal hobby at the corporation's expense. The incumbents, on the other hand, went to great lengths to portray Heyman and the other members of the Committee as inexperienced opportunists who lacked the sound judgment needed to steward a public corporation. Perhaps a new low in corporate conflict was reached when, after meeting Heyman's children at a social event, Werner commented that "[t]hey looked as though they were rented for the evening."
 
 
 26
 During the last few weeks of the campaign, the substantive economic issues took on even greater importance when GAF announced a series of proposed transactions. On April 10, the corporation announced that the board had approved a leveraged buy-out of the building materials group by Southwestern General Corporation. This transaction, however, was "subject, among other things, to the preparation and execution of definitive agreements", with "no assurance that [it] will ultimately be consummated." Two days later, on April 12, GAF announced that it had entered into a back-up agreement under which Odyssey Partners would undertake to complete the buy-out of the building materials group if the deal with Southwestern General fell through.
 
 
 27
 Predictably, both of these deals were assailed by the insurgents. Then, unpredictably, on April 22, less than one week before the annual meeting, GAF announced that it had entered into a contract to sell the chemical business to Allied Corporation. The Committee promptly claimed that the plan it had espoused from the outset of the contest had been vindicated. At the same time, it cautioned shareholders that this latter deal could be jettisoned if the Werner management were re-elected. In fact, after the district court enjoined the insurgents from taking office, GAF did announce that the transactions with both Southwest General and Allied had been cancelled.
 
 
 28
 The annual meeting on April 28 was just as chaotic as the last few weeks of the contest. In a transparent attempt to stave off defeat, the incumbent board refused to close the polls at the conclusion of the meeting. The Committee then obtained an order from the Delaware Chancery Court directing the Inspectors of Election to proceed with the tabulation of votes. The final tabulation confirmed that 58.6 percent of the shareholders favored the Committee over the incumbent board.
 
 D. The Connecticut Action
 1. The Complaint
 
 29
 On May 17, 1982, several months after the 1982 settlement between Heyman and GAF, Heyman's sister, Abigail, filed suit against him and his mother in the United States District Court for the District of Connecticut. Abigail's 28-page complaint alleged that while acting in several fiduciary capacities, including partner, attorney-in-fact, and trustee, Heyman had denied Abigail information concerning her personal assets and converted some of those assets to his own use. For example, the complaint charged that:
 
 
 30
 (1) Contrary to the express terms of Conn.Gen.Stat.Ann. Sec. 34-58 (West 1981), which provides that partners "shall render on demand true and full information of all things affecting the partnership to any partner", Heyman "consistently refused to disclose even the most basic or summary information concerning the partnership" into which he had placed Abigail's liquid assets;
 
 
 31
 (2) Heyman dealt with the assets of the partnership "as though personally owned" and on information and belief "diverted assets from this partnership into one or more * * * business entities, controlled or totally owned by him";
 
 
 32
 (3) Heyman made substantial contributions of Abigail's property to his personal charities without her knowledge or consent; and
 
 
 33
 (4) Heyman "utilized his control over her assets and trust funds for his own personal benefit, ignoring his duties as a trustee and/or agent, attorney-in-fact, and co-partner."
 
 
 34
 The complaint sought an accounting, an order requiring disclosure of the information withheld, an order requiring a separation of assets, compensatory damages, punitive damages, and treble damages under a Connecticut statute applicable to theft.
 
 2. Background of the Heyman Family Dispute
 
 35
 The Connecticut action arose out of what the special master appointed to supervise discovery in this case aptly described as "a very human family situation." When his father died in 1968, Heyman resigned his office as an Assistant United States Attorney in Connecticut in order to take charge of a successful family real estate business comprised of a series of partnerships, trusts, and closely held corporations. Sister Abigail, a professional photographer, had a stake in many of these ventures, but chose not to become actively involved. Instead, she granted Heyman a general power of attorney to conduct her financial affairs, similar to the power she had previously granted her father. It is undisputed that the family business, in general, and Abigail, in particular, have prospered in the fifteen years since Heyman assumed control.
 
 
 36
 The family relationship proceeded relatively smoothly until 1975, when Abigail, who had been divorced from her first husband, began living with a psychiatrist who was twenty years her senior and still married to his first wife. By this time, Heyman and his mother had begun to question Abigail's judgment, arguably with good cause. Just prior to her relationship with the psychiatrist, Abigail had become pregnant while unmarried, had an abortion performed, photographed her own abortion while the operation was in progress, published the photographs in a nationally circulated book, and discussed the matter in a televised interview. In addition, Abigail had suffered periods of severe depression and was receiving periodic psychiatric care.
 
 
 37
 With the onset of her relationship with the psychiatrist, whom she eventually married, Abigail began to demonstrate an interest in her financial affairs that she had never evidenced before. Heyman and his mother were convinced that Abigail was being manipulated by the psychiatrist, who they presumed to be interested in Abigail solely because of her wealth. Therefore, in 1976, they arranged to have Heyman transfer substantially all of Abigail's liquid assets, valued at approximately $850,000, along with a matching amount of his own assets, to an existing partnership between Heyman and Abigail (the Heyman Joint Venture). At the same time Heyman, acting as attorney-in-fact, signed Abigail's name to a new partnership agreement which in effect gave him exclusive control over these assets until 1990.
 
 
 38
 Over the next few years, Abigail made a number of requests for information concerning her financial affairs. After receiving what she apparently considered to be unsatisfactory responses from Heyman, Abigail revoked his power of attorney in September, 1981.
 
 3. The Sealing Orders
 
 39
 On May 26, 1982, only nine days after Abigail's complaint was filed, and before any responsive pleading, the parties in the Connecticut action entered into a stipulation and order pursuant to which all proceedings were stayed pending settlement negotiations aimed at separating Abigail's financial interests from the family business. Significantly, the stipulation further provided for the sealing of the entire court file on this intra-family dispute.
 
 
 40
 On November 9, 1982, the day before Heyman filed suit charging GAF with proxy violations arising out of the 1982 settlement, the parties in the Connecticut action entered into a second stipulation and order. It provided that the financial data produced by Heyman during the informal appraisal process that had taken place "shall be deemed to have been produced and received under seal" and could only be revealed to Abigail's law and accounting firms for settlement purposes.
 
 
 41
 Similarly, on January 27, 1983, the same day that Heyman demanded a list of GAF stockholders, the parties entered into a third stipulation which confirmed that "[t]he existence and contents" of all filed documents, all settlement discussions, and the circumstances underlying Abigail's allegations "shall remain confidential." This last stipulation also guaranteed that "[d]efendants shall cause any discovery process directed toward disclosure of any [of the] items [previously] referred to * * * to be resisted at no expense to plaintiffs, who shall cooperate with defendants in resisting such discovery process." All three of these stipulations were approved by Chief Judge Daly of the Connecticut District Court.
 
 
 42
 Heyman and his mother testified at their depositions in the instant action that they originally sought to seal the court file in May 1982 to maintain the confidentiality of a potentially embarrassing family dispute, not because Heyman was contemplating waging a proxy contest in 1983. However, Heyman also freely admitted that it was his ongoing struggle with GAF that led to the discovery provisions in the latter two stipulations.
 
 4. GAF's Motion to Intervene
 
 43
 Despite the Heymans' extensive efforts to keep their lawsuit private, the appearance sheet in the court file was somehow not initially placed under seal. This document, which identified the parties and characterized the action as one for "breach of trust", was discovered by a team of private investigators hired by GAF. On March 11, 1983, in the midst of the proxy contest, GAF moved to intervene in the Connecticut action for the limited purpose of gaining access to the information contained in the court file. GAF's primary argument in its moving papers was that its shareholders had a right to discover whether any shares of GAF stock were involved in the action. It also argued that the shareholders were entitled to know whether Abigail's allegations impugned her brother's integrity.
 
 
 44
 At the same time that it filed the motion to intervene, GAF distributed the following press release to the news media and the Wall Street brokerage community:
 
 
 45
 NEW YORK, March 13--GAF Corporation announced today that it has moved to intervene in an action brought by Abigail Heyman, individually and in behalf of a minor, against parties including Samuel J. Heyman, individually and as a trustee. Abigail Heyman is the sister of Samuel J. Heyman.
 
 
 46
 According to court records, the action is for breach of trust and is pending in the United States District Court for the District of Connecticut. Last May a writ of attachment for $10 million was obtained against Heyman in this suit which has since been released.
 
 
 47
 The papers and proceedings, including the court docket and the complaint, have been sealed at the request of Heyman and the other parties. Accordingly, the details of the complaint and related matters are not available to GAF, its shareholders, the press or the public at this time.
 
 
 48
 GAF, in seeking intervention in the suit, is not seeking any relief other than that the information in the suit be made available to the public and GAF shareholders. GAF's management believes that when a person such as Heyman asks stockholders of a public corporation to vote him into a position of trust in that corporation, all matters which may bear on his integrity and character should be made available to such stockholders.
 
 
 49
 Heyman's filings with the SEC show that certain trusts over which he has control own GAF stock. GAF is also seeking to ascertain whether any of such stock is the subject matter of, or could be affected by, the suit.
 
 
 50
 On March 31, Judge Daly denied GAF's motion to intervene. In a memorandum decision that was itself subject to the court's prior sealing orders, Judge Daly confined his analysis to GAF's principal argument that it should be permitted to discover whether control of any GAF stock was at issue. In this regard, he observed:
 
 
 51
 the Court's seal order in the present case does not preclude GAF from obtaining--or excuse Heyman from disclosing--the information which it seeks simply to verify from the court records.
 
 
 52
 GAF's motion for an expedited appeal from Judge Daly's ruling was denied by this court.
 
 E. The Instant Action
 1. GAF's Complaint
 
 53
 With its motion to intervene pending in the Connecticut action, on March 22, 1983 GAF filed its thirty-five page complaint in the instant action in the Southern District of New York. The first of its four causes of action alleged that the Committee's SEC filings, proxy materials, and statements to the press were false and misleading in violation of Sec. 14(a) and Rule 14a-9(a) in numerous respects. Among the specific instances cited were that the Committee (1) repeatedly overinflated the value of GAF's chemical business and classical radio station to make Heyman's " 'get rich quick' scheme" look more attractive; (2) misrepresented the circumstances surrounding the 1982 settlement; and (3) falsely accused management of not pursuing the various merger and sale opportunities in good faith.
 
 
 54
 The second and third causes of action alleged that Heyman, his mother, and a number of the family entities controlled by him violated Sec. 14(a) and Rule 14a-11, 17 C.F.R. Sec. 240.14a-11 (1983), by submitting only one Schedule 14B, see 17 C.F.R. Sec. 240.14a-102 (1983), for all GAF shares beneficially owned by Heyman and by failing to provide background information on each partner, officer, and director of these entities. GAF's final cause of action alleged that Heyman and the other nominee defendants violated Sec. 13(d), 15 U.S.C. Sec. 78m(d) (1983), and Regulation 13D, 17 C.F.R. Sec. 240.13d-1 et seq., for essentially the same reasons that applied to the Committee's proxy materials. Although GAF's complaint alluded in passing to two Reuters news releases which reported Heyman's reaction to GAF's press release regarding the Connecticut action, conspicuously absent from the complaint was any allegation that Abigail's suit might be material insofar as it cast doubt on Heyman's integrity.
 
 2. GAF Seeks Discovery
 
 55
 In early April, less than four weeks before the 1983 annual meeting, GAF sought discovery in the instant action concerning the facts underlying the Connecticut action from the Heymans and their counsel. The Heymans, however, set aside their family differences and banded together in opposing these requests on the ground that the sealing orders precluded any such inquiry. To dispel any doubts about her sympathies in the proxy context, Abigail submitted an affidavit on April 12 declaring her wholehearted support for her brother.
 
 
 56
 Faced with this obstacle, GAF sought relief from the special master Judge MacMahon had appointed to supervise discovery. After speaking with Judge Daly by telephone, the special master issued an order on April 21 upholding the Heymans' position. The special master reasoned that while
 
 
 57
 [i]t is clear to me based on my conversations with [Judge Daly] that he did not intend to preclude legitimate inquiry on Mr. Heyman's ownership and control of GAF stock * * * [which] is a matter of record * * * [i]t is also clear to me * * * that he intended to prevent any disclosure of the matters he ordered sealed, both in Connecticut and elsewhere.
 
 
 58
 The special master's order was confirmed on April 26 by Judge Knapp, then sitting in Part I, since Judge MacMahon was sitting by designation in another district.
 
 3. GAF Seeks Mandamus
 
 59
 GAF then petitioned this court for a writ of mandamus or prohibition permitting it to discover the facts underlying the Connecticut action. On April 27, the day prior to the annual meeting, an emergency panel of this court heard argument and issued an order granting the writ. "Assuming, without deciding, that Judge Daly could properly prevent disclosure of the documents and testimony he ordered sealed in the Connecticut action," the panel reasoned that "his sealing order could not prevent independent discovery of that information in a separate lawsuit." Thus, without disturbing the sealing orders themselves, the panel directed the special master and the district court to permit discovery of any documents that would have been discoverable if the Connecticut action had never been commenced.
 
 4. Proceedings Before the District Judge
 
 60
 In the wake of this ruling, GAF's management, sensing it had lost the April 28 election, returned to the district court on May 2 and moved for a preliminary injunction to delay certification of the election results until the district court could determine whether resolicitation was required. In its moving papers, GAF resurrected the argument it had suggested in its motion to intervene, but apparently since abandoned, that the Connecticut action might be material insofar as it cast doubt on Heyman's integrity and fitness to serve as a director. Following oral argument on May 12, Judge MacMahon granted a temporary restraining order. By memorandum opinion dated May 16, he entered a fourteen-day preliminary injunction to permit GAF to conduct discovery. In doing so he reasoned: "It is far better to have a short delay in the changing of the board, while GAF has an opportunity to ascertain the facts it seeks, than to reward the tactics used here with a victory in a proxy fight which may be tainted."
 
 
 61
 The information that GAF uncovered during the next two weeks has regrettably become the focus of this appeal. Although this court had not ordered that the Connecticut file be unsealed, for tactical reasons Heyman now decided to disclose its entire contents, after obtaining permission from his sister and approval from Judge Daly. Using Abigail's complaint as its blueprint, GAF deposed Heyman and his mother and engaged in related document discovery in an effort to substantiate the claims that Abigail had asserted, but had chosen not to press. Curiously, and perhaps significantly, GAF did not depose Abigail concerning her complaint and its underlying facts.
 
 
 62
 At the end of the two week period, Judge MacMahon heard oral argument at which GAF presented the fruits of its accelerated discovery. Relying primarily on Heyman's deposition and business records, GAF argued that four of the allegations in Abigail's complaint were sufficiently substantial to have required affirmative disclosure in the Committee's proxy materials. The first of these concerned an alleged denial of access to financial information, a denial that Heyman admitted in part. The second concerned an alleged breach of fiduciary duty arising out of Heyman's transfer of over $800,000 of Abigail's assets to the Heyman Joint Venture, which Heyman argued was designed to insulate Abigail from the ambitions of the psychiatrist. The third involved an alleged breach of duty related to Heyman's contributions of $40,000 of Abigail's money to certain charities, which Heyman claimed were not only sanctioned by Abigail, but were structured in a manner that was financially advantageous to her.
 
 
 63
 The fourth and most problematic of the allegedly material omissions was Abigail's general allegation that Heyman had used her assets "for his own personal benefit". GAF interpreted this broad allegation to apply to a $1,425,000 "cut-rate" loan from the Heyman Joint Venture to Heyman, despite the absence of any reference to this transaction in Abigail's complaint. The legality of the loan was debated at great length, with GAF arguing it was a clear case of self-dealing, and Heyman portraying it as no different than thousands of inter-entity loans within the family business over more than fifty years.
 
 
 64
 The day after argument was held, Judge MacMahon conducted a brief telephone conference with counsel to clarify the procedural posture of the case. After the judge expressed "astonishment" that no formal motion papers had been filed, counsel for GAF explained that "the procedure that we were basically contemplating is the procedure under Rule 65, in which we are seeking a preliminary injunction with the possibility of advancing to trial on the merits." When the court inquired whether "that is tantamount to a motion for summary judgment", counsel for GAF hedged his answer:Well, your Honor, we would be prepared to have your Honor consider it as a motion for summary judgment under Rule 56 or a trial of the merits under Rule 42 of the portion of the complaint that we presented, or a trial of the entire matter under Rule 65.
 
 
 65
 The court then asked for the views of opposing counsel, who responded:
 
 
 66
 Judge, there is not much I can say. They are the ones that are the moving party. I, obviously, would be amenable to anything the Court wants.
 
 
 67
 Finally, after additional discussion, counsel for GAF decided:
 
 
 68
 It would seem to me, your Honor, that to the extent you can put a label on that, it would be a motion for summary judgment. We are prepared to make that motion. All we wanted to do was to have our position considered on the merits and a Rule 56 motion certainly would be an appropriate vehicle for that and we would present it that way.
 
 
 69
 Judge MacMahon responded "All right, I will take it that way."
 
 5. Decision Below
 
 70
 In the decision below, however, the district judge treated GAF's request for permanent injunctive relief as both a motion for summary judgment under Fed.R.Civ.P. 56, and an application for an accelerated and separate plenary trial on the claims submitted under Fed.R.Civ.P. 42(b) and 65(a)(2) "[i]n the event * * * that a disputed issue of fact were discovered on appeal". Given the exigencies of the case, the court also deemed GAF's complaint amended to include what had now clearly become its central contention, that Heyman had failed to disclose material information regarding his fitness to serve as a director.
 
 
 71
 On the merits, the district court properly declined to address the validity of Abigail's claims. But it ruled that because the allegations in her complaint, if taken at face value, would constitute "blatant violations of elementary fiduciary duties", they were "so obviously important to the investor that reasonable minds cannot differ on the question of materiality." (citations omitted). GAF's press release concerning the Connecticut action did not, in the court's view, sufficiently cure this material omission since the shareholders were not informed as to the "specific allegations" or "the facts relating to them". The court also rejected defendants' contention that failure to disclose the information was mandated by the Connecticut sealing orders, stating that "it was Heyman himself who caused the proceedings to be sealed."
 
 
 72
 As to GAF's other argument, that Heyman had made false and misleading statements regarding his ownership and control of GAF stock, the district judge ruled that the possibility that a judicial separation of Abigail's assets from the Heyman family entities would dilute Heyman's control over GAF shares was too speculative. The court further reasoned that since at most 300,000 of the roughly 800,000 shares controlled by Heyman were at stake, any " 'cloud' over the ownership of GAF shares could not have led a reasonable shareholder to question Heyman's manifestation of concern for GAF, his substantial stockholdings therein, or his incentive to carry out his responsibilities as a director." GAF has not cross-appealed from this latter ruling.
 
 
 73
 On the basis of his conclusions, the district judge determined that the "drastic step" of resolicitation was the only appropriate remedy. He directed the defendants, in their resolicitation material, both to state that resolicitation had been ordered by the court and to accurately set forth the material allegations and facts pertaining to the Connecticut action. Finally, because over half of GAF's voting shares had changed hands in the three months since the original record date, the court established the date of its decision as the record date for the new election.
 
 II. DISCUSSION
 
 74
 The general legal standards governing this appeal are not in dispute. The point of departure is Sec. 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78n(a) (1982), which provides:
 
 
 75
 It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.
 
 
 76
 The primary operative regulation, SEC Rule 14a-9(a), 17 C.F.R. Sec. 240.14a-9(a) (1983), states:
 
 
 77
 No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.
 
 
 78
 In TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), the Supreme Court formulated the standard of materiality under Rule 14a-9(a) as follows:
 
 
 79
 An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. * * * Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.
 
 
 80
 Id. at 449, 96 S.Ct. at 2132 (footnote omitted).
 
 The TSC Court further observed that:
 
 81
 The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment.
 
 
 82
 Id. at 450, 96 S.Ct. at 2132 (footnotes and citations omitted). These authorities establish the framework within which we must review the district court's determination that non-disclosure of the Heyman family action in Connecticut was a material omission in the context of the GAF proxy contest.
 
 A. Threshold Issues
 
 83
 Before turning to the merits, we briefly consider the propriety and consequences of the expedited procedure employed below. Heyman contends that if summary judgment was improperly granted, the district judge erred in alternatively treating the proceedings before the court on June 1 as a plenary trial on the merits. He asserts that his counsel had no notice and never consented to this accelerated procedure. In addition, he argues that it is clear from the transcript of the June 2 telephone conference that GAF's application would be treated as a motion for summary judgment. Finally, he claims that the district court's remark that "[n]either party would be prejudiced" ignored the fact that defendants "may have wished to call witnesses at a trial."
 
 
 84
 We have little difficulty rejecting this argument. To begin with, the accelerated procedure was consistent with the understanding reached by the parties on May 24 that the matter was to be finally resolved, if possible, at a June 1 hearing before Judge MacMahon. Further, counsel for Heyman indicated during the telephone conference that "I, obviously, would be amenable to anything the Court wants." Most importantly, while Heyman "may have wished to call witnesses at a trial", he has not suggested on appeal who he would call or for what purpose. Nor has he contended in his briefs or at oral argument that a remand--as opposed to a reversal--should be ordered. Under these circumstances, we deem defendants to have waived any objection to the procedure employed. Plaintiff, of course, has no objection to the accelerated procedure.
 
 
 85
 Moreover, because we disagree with the district court's conclusion that this was one of the rare instances contemplated by the Court in TSC where a question of materiality under Rule 14a-9(a) could be resolved on summary judgment, we accept the district court's alternative method of disposition. We thus treat this appeal as one from a judgment entered following an accelerated trial on the merits based purely on documentary evidence including depositions. With the case in this posture, our scope of review is not limited by the clearly erroneous rule of Fed.R.Civ.P. 52(a), since the controlling issue of materiality turns on the application of a legal standard to the facts. Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195, 1200 n. 3 (2d Cir.1978).
 
 
 86
 B. The Materiality of the Connecticut Action
 
 
 87
 The positions of the parties regarding the central issue on appeal are fairly straightforward. Heyman contends that the Committee had no obligation to disclose in a GAF proxy fight either the contested, unproven, and unpursued allegations of a complaint filed in an unrelated intra-family dispute or the circumstances surrounding a family loan transaction not even mentioned in that complaint. In any event, Heyman argues, GAF's dissemination of the "breach of trust" allegations in its March 13 press release cured these omissions, since the "total mix" of information available to GAF shareholders would not have been significantly altered by fuller disclosure. On the other hand, GAF argues that the fact that a candidate for a position as a corporate fiduciary is a defendant in a pending lawsuit, charging him with improper self-dealing and other fiduciary misconduct, is necessarily important to stockholders called upon to decide who should be entrusted with the stewardship of their collective investment.
 
 
 88
 In considering these competing arguments, we are guided not only by the principles outlined above, but also by SEC Regulation S-K, 17 C.F.R. Sec. 229.10 et seq. (1983). Regulation S-K, together with more general provisions such as Rule 14a-9, "states the requirements applicable to the content of * * * proxy and information statements under Sec. 14 of the Exchange Act". The regulation provides the following instructions regarding involvement in legal proceedings that must be disclosed:
 
 
 89
 (f) Involvement in certain legal proceedings. Describe any of the following events that occurred during the past five years and that are material to an evaluation of the ability or integrity of any director, person nominated to become a director or executive officer of the registrant:
 
 
 90
 (1) A petition under the Federal bankruptcy laws or any state insolvency law was filed by or against, or a receiver, fiscal agent or similar officer was appointed by a court for the business or property of such person, or any partnership in which he was a general partner at or within two years before the time of such filing, or any corporation or business association of which he was an executive officer at or within two years before the time of such filing;
 
 
 91
 (2) Such person was convicted in a criminal proceeding or is a named subject of a pending criminal proceeding (excluding traffic violations and other minor offenses);
 
 
 92
 (3) Such person was the subject of any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction, permanently or temporarily enjoining him from, or otherwise limiting, the following activities:
 
 
 93
 (i) Acting as an investment adviser, underwriter, broker or dealer in securities, or as an affiliated person, director or employee of any investment company, bank, savings and loan association or insurance company, or engaging in or continuing any conduct or practice in connection with such activity;
 
 
 94
 (ii) Engaging in any type of business practice; or
 
 
 95
 (iii) Engaging in any activity in connection with the purchase or sale of any security or in connection with any violation of Federal or State securities laws;
 
 
 96
 (4) Such person was the subject of any order, judgment or decree, not subsequently reversed, suspended or vacated, of any Federal or State authority barring, suspending or otherwise limiting for more than 60 days the right of such person to engage in any activity described in paragraph (f)(3)(i) of this Item, or to be associated with persons engaged in any such activity; or
 
 
 97
 (5) Such person was found by a court of competent jurisdiction in a civil action or by the Commission to have violated any Federal or State securities law, and the judgment in such civil action or finding by the Commission has not been subsequently reversed, suspended, or vacated.
 
 
 98
 17 C.F.R. Sec. 229.401 (1983) (incorporated by reference in SEC Schedule 14A, Item 6, 17 C.F.R. Sec. 240.14a-101 (1983)).
 
 
 99
 Nothing in this detailed regulation, which has been relegated to a footnote in GAF's brief, required Heyman to make any disclosure about the unproven allegations in the Connecticut action, much less the disputed loan transaction. While this court and others have indicated that compliance with Schedule 14A does not necessarily guarantee that a proxy statement satisfies Rule 14a-9(a), see Zell v. Intercapital Income Securities, Inc., 675 F.2d 1041, 1044 (9th Cir.1982); Maldonado v. Flynn, 597 F.2d 789, 796 n. 9 (2d Cir.1979); Bertoglio v. Texas International Co., 488 F.Supp. 630, 647 (D.Del.1980); Cohen v. Ayers, 449 F.Supp. 298, 317 (N.D.Ill.1978), aff'd, 596 F.2d 733 (7th Cir.1979); Lyman v. Standard Brands, 364 F.Supp. 794, 796 (E.D.Pa.1973), the regulation does provide us with the Commission's expert view of the types of involvement in legal proceedings that are most likely to be matters of concern to shareholders in a proxy contest. See Exchange Act Release No. 15006, [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 81,649 (July 28, 1978) ("The categories of information about officers' and directors' involvement in litigation [set forth above] are material to investors. They represent factual indicia of past management performance in areas of investor concern.")
 
 
 100
 In our view, the regulation's emphasis on orders, judgments, decrees, and findings in civil proceedings, in stark contrast to its express coverage of all pending criminal proceedings, strongly suggests that regardless of how serious they may appear on their face, unadjudicated allegations in a pending civil action against a director-nominee should not automatically be deemed material. In a society as litigious as ours, where plaintiffs are permitted great latitude in their pleadings, a reasonable shareholder would not place much stock in the bald, untested allegations in a civil complaint not involving the subject corporation without first examining, among other relevant factors, the relationship between the parties, the nature of the allegations, the circumstances out of which they arose, and the extent to which the action has been pursued. Whether that information would be considered important in deciding how to vote would then depend on the issues involved in the proxy contest itself.
 
 
 101
 Applying the first part of this approach to the unique circumstances present here, all of the relevant factual indicia militate against a finding of materiality. First, the Connecticut action was "pending" only in a technical sense. The action was stayed on consent only nine days after it was commenced, before Heyman even filed a responsive pleading. No formal discovery had been conducted. As the special master, who presided over the discovery proceedings and witnessed the deposition testimony in this action, observed:
 
 
 102
 You are asking for everything because Abigail filed a lawsuit and then withdrew from filing a lawsuit. I gather there isn't any real discovery going on. The parties are working on some kind of settlement. Abigail is not a zealous litigant, or she certainly does not appear that way.
 
 
 103
 Second, the Connecticut action did not in any way involve GAF, cf. Zell v. Intercapital Income Securities, Inc., 675 F.2d at 1044-50 (non-disclosure of 22 major lawsuits against commonly controlled entities); Rafal v. Geneen, [1971-1972 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 93,505 (E.D.Pa.1972); Robinson v. Penn Central Co., 336 F.Supp. 655 (E.D.Pa.1971); Beatty v. Bright, 318 F.Supp. 169 (S.D.Iowa 1970), or for that matter any other public corporation, cf. Bertoglio v. Texas International Co., 488 F.Supp. at 661. Nor did Abigail's complaint allege any violations of the securities laws of the type referred to in Regulation S-K, cf. Bertoglio v. Texas International Co., supra (non-disclosure of consent decree and pending securities law allegations against "recidivist" securities law violator held material). While we do not mean to suggest that pending litigation against a director-nominee based on state law and involving a family or other non-public business can never be material, actions of that nature are less likely to be matters of importance to public shareholders.
 
 
 104
 Third, the circumstances surrounding Abigail's allegations negate their materiality. All available evidence suggests that the action was nothing more than the outgrowth of a intra-family feud between Abigail and her new husband on one side and her mother and brother on the other. While Abigail's complaint did contain a myriad of allegations, both "serious" and petty, her apparent overriding objective was to separate her financial interests from the family business. Once her mother and brother agreed to pursue an amicable settlement, she in effect voluntarily withdrew the action. Furthermore, she subsequently swore that she supported her brother's slate in the proxy contest.
 
 
 105
 Thus, viewed in context, the three specific allegations in Abigail's complaint seized upon by GAF raise no serious question about Heyman's fitness to serve as a corporate director. Of even less significance is the $1,425,000 loan transaction, which was never specifically referred to in Abigail's complaint, but was the cornerstone of GAF's presentation below. While it may be true, as the district judge observed, that Abigail's general allegation as to diversion of assets was "broad enough to pertain to the loan" there is no basis for assuming that Abigail had any intention of asserting such a claim. Given that the "proxy rules simply do not require management to accuse itself of antisocial or illegal policies", Amalgamated Clothing & Textile Workers Union v. J.P. Stevens & Co., 475 F.Supp. 328, 331-32 (S.D.N.Y.1979), vacated as moot, 638 F.2d 7 (2d Cir.1980) (per curiam); see SEC v. Chicago Helicopter Industries, No. 79-C-0469 (N.D.Ill. Jan. 18, 1980) (vacated pursuant to settlement, March 7, 1980), it would be fundamentally unfair to require Heyman to have anticipated and then disclosed the interpretation that GAF would place on the open-ended language of Abigail's complaint once the proxy contest was over. See Ferrara, Starr & Steinberg, Disclosure of Information Bearing on Management Integrity and Competency, 76 Nw.U.L.Rev. 555, 609 (1981).
 
 
 106
 Moreover, it is hardly surprising that Abigail's 28-page complaint never mentioned the loan transaction complained of by GAF. The loan was permitted by the elder Heyman's will and, as the district judge found, was "typical of many transactions engaged in by Heyman on behalf of the Heyman family entities" "except possibly in magnitude and duration". It would seem the "reasonable investor" would not have been influenced to change his proxy vote had the loan been disclosed.
 
 
 107
 The significance of the Connecticut action fades even further when its dormant allegations are compared with the issues that were raised in the proxy contest. Applying the literal language of Rule 14a-9(a), under which information omitted from a proxy statement is material if it is "necessary in order to make the statements therein not false or misleading", the district judge found that the Committee's proxy materials were defective because Heyman "presented himself to the shareholders as a man of considerable accomplishment and integrity" but "failed to hint at the serious allegations lodged against him or the transactions which are the basis of these claims." After reviewing the volumes of material that were generated during the proxy contest, however, we have found only a handful of excerpts that tend to support this view. For example, at the outset of the campaign, Heyman characterized himself and the Committee as "[h]aving all had extensive experience as responsible members of the corporate, business, and professional worlds". Similarly, after management pulled a complete reversal at the close of the contest and announced the proposed sale of the chemical business, the Committee inquired in a letter to shareholders, "Who can you rely upon to effectively distribute the proceeds?" But isolated excerpts of this nature cannot obscure the fact that the overwhelming weight of both sides' proxy literature and advertisements focused on fundamental economic issues of concern to shareholders: the record of management and the competing plans for realizing the asset values of GAF. Given the predominance of these economic issues, the district judge erred in holding that there was "a substantial likelihood" that a reasonable shareholder would have considered the Connecticut action "important in deciding how to vote." TSC, 426 U.S. at 449, 96 S.Ct. at 2132.
 
 
 108
 The court further erred by holding there was a "substantial likelihood" that disclosure of the action and its underlying facts "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. (footnote omitted). The fact that Heyman had been sued by his sister for "breach of trust" was disseminated by GAF more than six weeks before the annual meeting in its March 13 press release. The gist of the press release was also reported in the two Reuters news stories alluded to in GAF's complaint. Further, on the day of the election, a major story in the Wall Street Journal referred to GAF's attempt "to open the court papers in a suit brought against Mr. Heyman by his sister Abigail over family matters" as one of "a number of gambits that backfired or offended important stockholders."
 
 
 109
 GAF contends that "[n]o information whatever about the suit was ever included in direct communications to GAF shareholders." However, Heyman responds without contradiction "that GAF itself directly sent its press release to more than a dozen major institutions holding, or known to represent shareholders holding, a substantial number of GAF shares."
 
 
 110
 While there can be no doubt that the allegations and underlying facts of the Connecticut action were not "thoroughly aired", cf. Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d at 1200, we are convinced that this information "is of such dubious significance" that its disclosure may have "accomplish[ed] more harm than good". TSC, 426 U.S. at 448, 96 S.Ct. at 2131. In the "hurly-burly" of this contest, General Time Corp. v. Talley Industries, Inc., 403 F.2d 159, 162 (2d Cir.1968), cert. denied, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969), particularly in its last few weeks when GAF announced deal after deal after deal, the shareholders had their hands full sorting out the proposed transactions and evaluating them in light of the combatants' competing programs. While GAF's incumbent management obviously would have preferred to shift attention away from these core economic issues, "bury[ing] the shareholders in an avalanche of trivial information", TSC, 426 U.S. at 448, 96 S.Ct. at 2131, would scarcely have served the interests of corporate democracy.
 
 
 111
 Moreover, the district court found that a reasonable person could conclude that Heyman had "acted with the best of motives, in good faith, in the best interests of Abigail, and for her benefit and protection." If resolicitation were required, Heyman would be free to characterize the facts underlying the Connecticut action in a similarly favorable fashion. In addition, he could state that Abigail, the supposed victim of his "breach of trust", supported his slate. It is therefore likely that the impact of GAF's press release would have been diminished rather than bolstered by any further disclosure.
 
 
 112
 Our conclusion that non-disclosure of the Connecticut action was not a material omission is reinforced by several additional factors. First, we consider it revealing that it was not until May 2, after the results of the election were apparent, that GAF asserted for the first time below that Heyman's failure to disclose the suit was material. GAF knew as early as March 13, when it issued its press release, that Abigail had sued Heyman for "breach of trust". Indeed, when it moved on March 11 to intervene in the Connecticut action, one of GAF's arguments was that the suit might implicate Heyman's integrity and fitness to serve as a director. Yet when it filed its complaint in this action on March 22, GAF advanced no such claim. Thus, there is a hollow ring to GAF's present argument that it was not until after this court issued the writ of mandamus that it could possibly have discovered the information necessary to support the theory upon which its whole case now rests.
 
 
 113
 Second, we cannot overlook that GAF is urging this court to hold Heyman to a stricter standard than GAF itself followed in deciding whether to disclose that a number of its incumbent directors had been defendants in various lawsuits alleging breach of fiduciary duty. Heyman claims, and GAF does not dispute, that (1) incumbent directors Sokol and Sommer were each alleged to have breached fiduciary duties as directors of American Cyanamid Company and Bristol-Meyers Company, respectively, and to have violated the securities laws, and that settlements in those actions resulted in tightening the control of the audit committee of each company; (2) incumbent director Berner was alleged to have breached fiduciary duties as president and chairman of the board of Curtiss-Wright Corporation by taking excessive compensation, and that settlement of the suits against him resulted in restricting his compensation and future rights to stock under Curtiss stock plans; (3) this court has previously determined that Berner committed a breach of trust and a violation of securities laws by unlawfully giving his brother-in-law confidential information which in turn was used to purchase stock at an unfair advantage; and (4) Berner and Werner were charged with breaching fiduciary duties as directors of GAF, by approving Werner's excessive compensation, and that settlement of this suit resulted in "measurable benefits to the Company."
 
 
 114
 At oral argument, GAF sought to distinguish these cases on the ground that they were all closed more than five years ago. But this at most establishes that GAF had complied with the "minimum" requirements of Schedule 14A. Applying to the incumbents the same sweeping standard that GAF would have us apply to Heyman, the integrity and fitness of these directors had been called into question to a sufficient extent to trigger a disclosure requirement under Rule 14a-9(a). If anything, the final decision or settlement agreement in a closed case involving management of a public corporation should be considered more important to voting stockholders than unadjudicated allegations in a pending family lawsuit.
 
 
 115
 This last point underscores the boundlessness of the disclosure requirement imposed by the district judge. Vast numbers of allegations arguably implicate a prospective director's "integrity and fitness". The ruling below, if left intact, would lead to a situation where proxy contestants, in order to minimize the risk of having an election set aside, would have to include in their solicitation materials descriptions, explanations, and denials regarding allegations in derivative actions, class actions, matrimonial disputes, and a host of other legal matters, all unrelated to the business of the subject corporation.
 
 
 116
 Furthermore, under the decision below, both sides in a proxy contest would have every incentive and legal right to pursue massive discovery to unearth facts which, it can later be claimed, amount to a breach of fiduciary duty that should have been alleged in a prior action against an opposing candidate. As this case graphically illustrates, the litigation ubiquitous in every proxy contest would thus become a forum for litigating, possibly relitigating, the issues in any pending or prior suit involving a director-nominee.
 
 
 117
 Finally, we think the district court was unduly influenced by what it perceived to be Heyman's bad faith in resisting GAF's efforts at discovery in the instant action. While we express no view on the wisdom of sealing the Connecticut action in the first place, the desire of the Heymans to keep their family dispute private is certainly understandable even in the absence of a proxy fight. This is not to say that the absence of an affirmative disclosure requirement is tantamount to a license to conceal. But the first three judicial officers who reviewed the sealing orders--Judge Daly, the special master, and Judge Knapp--all agreed with Heyman's interpretation that he could not properly discuss the sealed materials. That this court took a different view on the petition for mandamus does not mean, as the district court suggested, that Heyman was guilty of "suppression" or "obstruction".
 
 III. CONCLUSION
 
 118
 The battle for control of GAF may not have been, as Heyman now claims, "a textbook case of corporate democracy". Nevertheless, it would be a perversion of the policies underlying Sec. 14(a) and Rule 14a-9(a) to frustrate the will of a clear majority of GAF shareholders and require a new election under the circumstances present here. As Judge Friendly observed in a closely related context in Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937 (2d Cir.1969):
 
 
 119
 Congress intended to assure basic honesty and fair dealing, not to impose an unrealistic requirement of laboratory conditions that might make the new statute a potent tool for incompetent management to protect its own interests against the desires and welfare of the stockholders. These considerations bear on the kind of judgment to be applied in testing conduct--on both sides--and also on the issue of materiality.
 
 
 120
 Id. at 948.
 
 
 121
 This was a proxy contest fought on the issues of GAF's financial performance and future corporate policy. Presented with a clear choice, the shareholders voted decisively in favor of the insurgent slate. Given this resounding mandate, it is inconceivable that fuller disclosure of the dormant Connecticut action would have had "a significant propensity to affect the voting process." TSC, 426 U.S. at 449, 96 S.Ct. at 2132 (quoting Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970) (emphasis in Mills )).
 
 
 122
 The judgment of the district court is therefore reversed. The mandate shall issue forthwith.
 
 
 
 *
 Honorable James S. Holden, of the United States District Court for the District of Vermont, sitting by designation