UNITED STATES of America, Appellee,

v.

Clark J. MATTHEWS II, Defendant-Appellant.

No. 475, Docket 85–1274.

United States Court of Appeals, Second Circuit.

Argued Nov. 20, 1985.

Decided March 27, 1986.

See also 601 F.Supp. 430.

Robert B. Fiske, New York City (Sarah S. Moss, Davis Polk & Wardwell; Gary P.

Naftalis, Stuart J. Baskin, David S. Frankel and Kramer, Levin, Nessen, Kamin & Frankel, N.Y. City, of counsel), for defendant-appellant.

Jane Simkin Smith, Asst. U.S. Atty., Brooklyn, N.Y., (Raymond J. Dearie, U.S. Atty. and L. Kevin Sheridan, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before VAN GRAAFEILAND and NEWMAN, Circuit Judges, and WYATT, District Judge.[*]

VAN GRAAFEILAND, Circuit Judge:

Clark J. Matthews, II, appeals from a judgment of the United States District Court for the Eastern District of New York (Sifton, J.) convicting Matthews of violating section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) and SEC's Implementing Rule 14a–9, 17 C.F.R. 240.-14a–9. This conviction was based on the second count of a two-count indictment. The first count charged that Matthews and S. Richmond Dole conspired with each other and with others to bribe members of the New York State Tax Commission in order to obtain favorable rulings on tax matters of interest to the defendants' employer, The Southland Corporation, and to file United States income tax returns for Southland which falsely listed the bribe payment as a legal fee. Both defendants were acquitted on this count.

The second count, which was against Matthews alone, charged in substance that Matthews' election to the Southland Board of Directors in 1981 was accomplished by means of a proxy statement which failed to disclose, among other things, that he was a member of the conspiracy alleged in Count I. For the reasons that follow, we reverse the judgment of conviction and remand to the district court with instructions to dismiss the indictment.

Prior to his conviction in this case, Clark Matthews had had an honorable career. He was born in Arkansas City, Kansas, but

[*] Of the United States District Court for the Southern District of New York, sitting by designation.

lived most of his forty-eight years in Texas. After being graduated from high school in Midland, Texas, he attended Southern Methodist University and Southern Methodist Law School. Following his admission to the bar, he worked as a staff attorney for the SEC for two years. He then served for two years as a law clerk for Judge Joe Estes of the United States District Court for the Northern District of Texas (for some years Chief Judge of that Court). Thereafter, in 1965, he became a staff attorney for the Southland Corporation, a large commercial company with headquarters in Dallas. He subsequently became Southland's General Counsel and is now its Executive Vice President and Chief Financial Officer.

In 1972 Southland became involved in litigation with the New York State Department of Taxation and Finance regarding Southland's asserted obligation to pay sales taxes owed by some of its franchised stores. Eugene DeFalco, then manager of Southland's Northeastern Division, who was the Government's principal witness and an admitted liar and thief, testified under grant of immunity that he inquired of one John Kelly, another immunized thief and liar, whether Kelly knew of anyone who could help in resolving the tax problem. Kelly arranged for DeFalco to meet with a New York attorney and City Councilman, Eugene Mastropieri.

According to DeFalco, Mastropieri informed him that the matter might require "heavy entertainment", which DeFalco took to mean a bribe. DeFalco testified that he told S. Richmond Dole, Southland's Vice President for Franchise Stores, that, in his opinion, somebody was going to be paid off. This testimony was denied by Dole. DeFalco also testified that, when Dole refused Mastropieri's request that he be paid in cash, Kelly suggested payment by way of a bill purporting to cover the lease of an airplane. This proposal brought Matthews into the picture for the first time. When Dole conveyed the lease proposal to Matthews with the explanation that Mastropieri wanted to conceal the legal fee from his law partner, Matthews telephoned DeFalco and told him that "Southland doesn't pay legal bills in the form of airplane leases [and] he did not want to see any more funny proposals coming through like the airplane lease...." When DeFalco assured Matthews that the payment to Mastropieri was in fact a legal fee, Matthews replied that "if it's a legal fee, we are going to pay it as a legal fee, not as something else."

In July 1977 DeFalco sent Dole a bill from Mastropieri for legal services in the amount of $96,500, which Dole processed for payment. The bill neither was seen nor approved by Matthews. Southland's check in payment was delivered to Mastropieri by Kelly who, upon instructions from DeFalco, secured a blank check from Mastropieri in exchange, which Kelly filled out in the same amount as the Southland check. Kelly promptly deposited Mastropieri's check in a Toronto bank where "nobody would know about it". On August 8, 1977 DeFalco arranged to have $10,000 transferred from Kelly's Toronto account to DeFalco's account at The Chase Manhattan Bank. Thereafter, on August 23rd, DeFalco opened an account in his own name at the Toronto bank and had Kelly transfer $20,000 into that account. He also had five checks totalling $18,500 issued for his own personal use. On March 22, 1978 DeFalco started drawing from his Toronto account, and, by August 16, 1979, the account was closed. In all, DeFalco stole $48,500 of Southland's money. The balance of $48,000 was taken by Kelly, $20,000 on September 21, 1977 and $28,000 on July 10, 1979. Not a penny was used to bribe anyone.

While DeFalco and Kelly were in the process of stealing Southland's money, Southland, together with hundreds of other corporations, *see Decker v. Massey-Ferguson, Ltd*, 681 F.2d 111, 118 (2d Cir.1982); Branch and Rubright, *Integrity of Management Disclosures Under the Federal Securities Laws*, 37 Bus.Law. 1447, 1450 (1982), was conducting an internal questionable payments investigation, which it called the Business Ethics Review. The respected Washington law firm of Arnold

and Porter had been retained as consultant for the Review, which was being handled by Southland's legal department. John Fedders, an Arnold and Porter partner with extensive experience in the field, worked closely throughout the Review with Matthews, then General Counsel, advising and assisting him in the preparation of questionnaires, the handling of interviews, the evaluation of information, and the reporting of results.

In August 1977 Matthews learned for the first time of Mastropieri's $96,500 bill. Because Matthews thought the bill was much too high, he instructed Michael Davis, a staff attorney who was assisting in the Business Ethics Review, to add Mastropieri's fee to the matters to be investigated. Accordingly, when Eugene Pender, Southland's controller, reported in his Review questionnaire that he suspected Mastropieri's bill was inflated to cover costs other than legal fees, Matthews told Davis to interview him. Following the interview, Davis reported to Matthews that "Pender did not have any specific facts which caused him to feel that way . . . he just felt that the bill appeared high."

Although DeFalco had indicated in his Review questionnaire that he had no knowledge of any wrongdoing, Matthews and Davis interviewed him together following a meeting of Division managers at a Dallas hotel on October 17, 1977. All three participants testified that at no time during this meeting did DeFalco reveal any plan to bribe a state tax official. DeFalco testified, however, that, following the meeting, he took Matthews aside in the hotel parking lot and told him that a $5,000 bribe already had been paid. Both Davis and Matthews denied that this parking lot conversation had taken place. If in fact DeFalco made the statement, it was a blatant lie. No bribe ever was paid.

Davis next interviewed Frank Kitchen, DeFalco's immediate supervisor. Kitchen told Davis that, some months before, he, John Thompson, Chairman of Southland's Board of Directors, and Dole had discussed the sales tax cases with DeFalco at a sales meeting in Hartford, Connecticut, and he formed a suspicion that an improper payment might be lurking somewhere in the background. When questioned by Davis as to the basis for this suspicion, Kitchen could point only to Mastropieri's Italian name, his high fee, the reference to entertainment expenses, and the location of the case in New York. When Matthews was informed of Kitchen's suspicions, Matthews insisted that Kitchen amend his theretofore negative responses to the Review questionnaire to incorporate his orally expressed suspicions. Matthews also interviewed both Thompson and Dole, both of whom assured him that Kitchen's suspicions were groundless.

Matthews then consulted G. Duane Vieth, another Arnold and Porter partner, concerning the advisability of interviewing Mastropieri directly. After consulting with Fedders, Vieth told Matthews to go ahead with the interview. Fedders then gave Matthews detailed instructions on how the interview should be conducted. On January 10, 1978 Matthews spoke with Mastropieri by telephone from Philadelphia, after a snowstorm prevented a scheduled face-to-face meeting in New York City. Mastropieri's responses to Matthews' questions concerning the sales tax dispute disclosed a comprehensive knowledge of the cases. In response to Matthews' questions about his fee, Mastropieri indignantly told Matthews that the amount of the fee was justified, that he had received the entire amount, and none was being paid to anyone else.

When Matthews reported the results of his interview to Fedders, Vieth, and the audit committee of Southland's Board of Directors, it was agreed that, because they had no proof of a bribe and because of the possibility of a suit for libel and slander, the matter should not be discussed in the formal Business Ethics Review report which was submitted to the Board of Directors on January 25, 1978.[1] Nonetheless,

---

1. The several witnesses who were questioned concerning this matter testified as follows:

despite Mastropieri's denial of wrongdoing,[2] despite the fact that DeFalco and Kelly already had stolen $48,500 of Southland's money, despite the fact that not a penny had been paid to a member of the New York State Tax Commission, and despite the district court's correct charge that Matthews could not be convicted of the crime of conspiracy if all he did was to conceal its existence, the Government contends that Matthews knowingly joined an ongoing conspiracy to bribe the tax officials on January 25, 1978 when he failed to disclose the existence of the conspiracy in his report to the Board of Directors.

#### Testimony of Matthews

Q  Now, at the conclusion of all this, what was the decision that was reached at the audit committee level there by yourself, Mr. Davis, the outside expert, Fedders, and the audit committee as to the Mastropieri matter?

A  We concluded that we had no proof that there had been a bribe or any improper use of the money.

We took into consideration our concerns, but we also took into consideration that there were continuing to be sales tax cases filed and that there had been no unusual activity in those cases or no resolution during this period of time.

And based on the fact that we did not have any proof we determined that it would be inappropriate on a sensitive matter of this nature to include it in the written report, but that we would make an oral report on the matter to the board.

Q  And reaching that conclusion, did you and Mr. Davis and members of the audit committee rely on the advice of your outside lawyer, John Fedders?

A  Yes, sir.

Q  And was that his advice?

A  Yes, sir.

Q  Do you recall whether or not Fedders had raised any issue about libel or slander in connection with the discussion of whether to put the Mastropieri matter in the written paper?

A  Yes, sir, he had.

My memory is that there were discussions between Fedders and Mr. Vieth concerning whether or not it would be in the written report.

And there were a number of other things that were mentioned, and one of which was the potential for libel or slander.

#### Testimony of Audit Committee Member William Atwell

Q  What circumstances, Mr. Atwell, led that matter to be omitted from the Business Ethics Review report?

We are not at all surprised that the jury acquitted Matthews of the charges in Count I, and we are not completely comfortable with the Government's contention that the acquittal was based on the running of the statute of limitations. The Government argues that we must assume the jury followed the district court's instruction not to convict Matthews on Count II unless it either found him guilty of the crime charged in Count I or not guilty by reason of the statute of limitations. Although this argument states generally sound doctrine, *United States v. Kaplan,* 510 F.2d 606, 611 (2d Cir.1974), it comes with poor grace

A  It was a joint decision of the outside counsel, and the inside counsel of Southland, that the matter was thoroughly looked into and nothing illegal was found pertaining to the Mastropieri New York sales tax case, and for that reason there was no thought of putting it in the report of the Business Ethics Review to the Board of Directors.

#### Testimony of Michael Davis

Q  Now, the conclusion—by the time—by the time this was all investigated, what was your conclusion as to whether or not you could prove that a bribe had been paid?

A  We couldn't prove a bribe had been paid. We didn't think one had.

Q  And were you concerned at all about libel or slander?

A  Certainly. We didn't want to go around accusing people of things that we couldn't prove.

Q  In your decision to put—not to put it in a formal written report, was that something that was agreed to by Mr. Fedders?

A  Yes, sir.

Q  And was that something that was agreed to by the Audit Committee?

A  Yes, sir.

#### Testimony of John Fedders

Q  Would you tell us what were the reasons that were discussed and the conclusions that were reached as to why it shouldn't be put in the document?

A  As I said, we didn't have proof. It was a matter of concern, but there was not sufficient proof.

2.  Although the Government attempts to downplay Matthews' undisputed testimony concerning Mastropieri's denial of wrongdoing, the Government's own proof shows that, when DeFalco was told by Matthews of his intention to interview Mastropieri, DeFalco instructed Mastropieri to assure Matthews that there was no wrongdoing. This, of course, undercuts DeFalco's disputed testimony that he had told Matthews that a $5,000 bribe already had been paid.

from a prosecution team which successfully opposed Matthews' request for a special verdict or jury interrogatory that would have precluded the making of the argument. This interrogatory, which was requested not once, but twice, would have asked the jurors to state whether, if they found a verdict of not guilty on Count I, that verdict was based on the running of the statute of limitations. It would have been quite proper for the district court to have submitted this query to the jury. *See United States v. Ruggiero*, 726 F.2d 913, 922–23 (2d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984); *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir.1981), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Quicksey*, 525 F.2d 337, 340–41 (4th Cir.1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976). An affirmative answer by the jury would have eliminated any taint of inconsistency between the assumption of guilt now urged by the Government and the presumption of innocence, one of the strongest presumptions in the law, *United States v. Thaxton*, 483 F.2d 1071, 1073 (5th Cir.1973); *see Taylor v. Kentucky*, 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978).

We note also that the issue of statutory time limitations virtually was ignored in the summations of counsel, and this, perhaps, was because the running of the limitation period was at best only a partial defense. The filing of Southland's allegedly fraudulent 1977 United States tax return, which was a significant part of the conspiracy alleged in Count I, took place on September 15, 1978, and the indictment against Matthews was filed on July 26, 1984, well within the statutory period of six years, *see* 26 U.S.C. § 6531.

Of course, the issue on this appeal is not whether the jury found Matthews guilty of conspiracy in 1985, but whether Matthews should have publicly pronounced himself guilty in 1981. We have expressed our misgivings concerning the assumed finding of guilt by the jury simply because the greater the uncertainty that exists today, the less reason there was for Matthews to confess seven years ago that he was guilty. However, regardless of the merits of the Government's contentions concerning the basis of the jury's verdict on Count I, we find no merit in the Government's argument that Matthews violated section 14(a) and Rule 14a–9 by not confessing that he was guilty of conspiracy three years before he was indicted on that charge.

Section 14(a) makes it unlawful for any person to solicit or to permit the use of his name to solicit any proxy "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." In the exercise of the power conferred upon it by section 23(a) of the Securities Exchange Act, 15 U.S.C. § 78w(a), the Commission promulgated Rule 14a–9, which reads in pertinent part as follows:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

The Commission also has promulgated rules dealing specifically with proxy statements. *See* Schedule 14A, 17 C.F.R. § 240.14a–101. Item 6 of this section covers statements used in the election of directors and executive officers, and incorporates the disclosure requirements of Item 401 of Regulation S–K, 17 C.F.R. § 229.-401. Item 401 provides that a candidate for director must disclose whether he has been "convicted in a criminal proceeding or is a named subject of a pending criminal proceeding (excluding traffic violations and

other minor offenses)" providing that the incident in question occurred during the preceding five years and disclosure is material to an evaluation of the candidate's ability or integrity. 17 C.F.R. § 229.401(f).

In November 1980 attorneys at Arnold and Porter were informed that the federal prosecutor who had been presenting evidence to a grand jury during the preceding six months concerning possible criminal activities of Councilman Mastropieri now regarded Southland and DeFalco as targets of the investigation and Matthews and Dole as subjects.[3] On January 23, 1981 four Arnold and Porter partners, including Peter Bleakley, the partner with principal responsibility for the Southland account, attended a meeting of Southland's Board of Directors and reported this change of events to them. The Board was told that this involved the same matter that Vieth and Fedders had reported three years before. The minutes of the January 28, 1981 meeting state:

> Mr. Vieth then described the scope of an investigation by a Federal Grand Jury sitting in the Eastern District of New York. There followed a discussion of the investigation.

With full knowledge of Matthews' status as a "subject" of the grand jury's investigation, the Chairman of the Board nonetheless asked Matthews if he would run for election to the Board. Matthews inquired of Bleakley if, under the circumstances, he should run, and Bleakley told Matthews that there was no reason for him not to do so. Upon further inquiry by Matthews concerning disclosure, Bleakley told Matthews that Bleakley and his partners did not believe that the federal securities laws

required Matthews to disclose that he was a subject of the investigation. Matthews ran and was elected.

Two years later, the grand jury returned an indictment charging Mastropieri, Dole and Southland with the same double objective conspiracy subsequently charged in the instant case, *viz.*, the bribing of New York tax officials and the defrauding of the United States by misdescribing the bribe as a legal fee. *See United States v. Southland Corp.*, 760 F.2d 1366 (2d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 82, 88 L.Ed.2d 67 (1985). The wisdom of using special verdicts was demonstrated in that earlier case by the fact that the jury convicted Mastropieri of conspiracy to achieve both objects of the conspiracy, while Southland was found guilty of conspiring only with respect to the tax fraud objective. The jury could not agree on either charge with respect to Dole. Matthews was not indicted and did not testify. On August 2, 1984 Dole was reindicted and, in this indictment, the indictment now before us, Matthews was named as a co-conspirator. A second count, the proxy statement, securities count, was added against Matthews alone.

▮ There can be little question that Congress delegated to the SEC the prime responsibility for seeing to the enforcement of the federal securities laws. *Natural Resources Defense Council, Inc. v. SEC*, 606 F.2d 1031, 1036 (D.C.Cir.1979); *SEC v. Kaplan*, 397 F.Supp. 564, 567 (E.D.N.Y. 1975). Pursuant to section 21(a) of the Exchange Act, 15 U.S.C. § 78(u)(a), the Commission is empowered to conduct investigations into possible violations of the Act and the Commission's regulations enacted

---

3. There is a clear distinction between the "subject" of a grand jury investigation and the "target" of such an investigation. One about whom a grand jury seeks information in an investigation of possible wrongdoing that not yet has focused on the individual involved is a "subject" of the investigation. The Department of Justice guidelines define a "target" as a "person as to whom the prosecutor or the grand jury has substantial evidence linking him/her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant."

*United States Attorney's Manual* § 9–11.260 (June 15, 1984); *see United States v. Winter*, 348 F.2d 204, 207–08 (2d Cir.), *cert. denied*, 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965); *People v. Steuding*, 6 N.Y.2d 214, 216, 189 N.Y.S.2d 166, 160 N.E.2d 468 (1959). In accordance with longstanding practice in this Circuit, if a grand jury witness is considered to be a "target", he must be informed of that fact. *United States v. Jacobs*, 547 F.2d 772, 774 (2d Cir.1976), *cert. dismissed*, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978).

pursuant thereto. *SEC v. Brigadoon Scotch Distributing Co.,* 480 F.2d 1047, 1050 (2d Cir.1973), *cert. denied,* 415 U.S. 915, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974). Following such investigations, the Commission may impose administrative sanctions, apply for judicial relief by way of mandamus or injunction, or refer the matter to the Department of Justice for criminal prosecution. Note, *The Securities and Exchange Commission: An Introduction to the Enforcement of the Criminal Provisions of the Federal Securities Laws,* 17 Amer.Crim.L.Rev. 121, 123 (1979). Although "[t]raditionally, there has been a close working relationship between the Justice Department and the SEC," H.R.Rep. No. 95–650, 95th Cong., 1st Sess. 10 (September 28, 1977), *quoted in United States v. Fields,* 592 F.2d 638, 646 n. 19 (2d Cir. 1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979), in the instant case, the United States Attorney's office proceeded on its own. In fact, both the then local SEC Administrator and a former SEC General Counsel publicly questioned the wisdom of trying Matthews on the securities count. *See* Wall St. J., February 5, 1985, at 20, col. 1.[4] The results of proceeding without the benefit of SEC expertise are evident throughout the proceedings, beginning with the indictment itself.

The Proxy Statement upon which the Government's charges were based was for Southland's 1981 Annual Shareholders Meeting, at which eleven unopposed candidates for directorships, including Matthews, were elected. The Statement gave only basic information concerning each candidate. Insofar as Matthews was concerned, the Statement said that Matthews was forty-four years of age, that he served as Vice President and General Counsel from 1973 to 1979 and as Executive Vice President and Chief Financial Officer since

1979. The Statement also set forth Matthews' "Cash and cash-equivalent forms of remuneration" and the extent of his "Security Ownership." The Government contends that this simple recital was made false and misleading in violation of Rule 14a–9(a) because it (1) failed to disclose that Matthews had engaged in a conspiracy to bribe New York public officials and to defraud the United States by preventing the IRS from determining the true nature of the business expense deductions and (2) failed to disclose that Matthews had failed to disclose to the audit committee of the Board of Directors, Southland's independent auditors, outside tax counsel, the IRS, the SEC, the FBI and others that he was engaged in the conspiracy.

The Government argued under Count I that Matthews became a member of the conspiracy on the day he submitted his Business Ethics Review report to the Board of Directors, when, according to the prosecutor, "he held the truth and the lie in each hand and decided to give the lie to the Board of Directors." When the prosecutor thereafter turned to Count II, he argued that Matthews' failure to disclose to the shareholders that he had failed to disclose to the Board put him in violation of Rule 14a–9. We note as a preliminary matter that the evidence does not clarify precisely what facts Matthews should have told the shareholders he failed to disclose to the Board.

"Liability under Rule 14a–9 is predicated upon a showing that an allegedly omitted fact is true." *Bertoglio v. Texas International Co.,* 488 F.Supp. 630, 649 (D.Del. 1980); *see Cohen v. Ayers,* 449 F.Supp. 298, 317 (N.D.Ill.1978), *aff'd mem.,* 596 F.2d 733 (7th Cir.1979). Overstatement can be as seriously misleading as understatement. *Electronic Specialty Co. v. Inter-*

4. Regional Director Ira Sorkin said "I don't know of any other case where someone is accused of failing to disclose a crime they haven't been convicted of." He said that prosecutors in the instant case were pushing "an expansion of the concept" of an executive's liability in failing to disclose pertinent information and concluded "It's a new approach."

Former General Counsel Harvey L. Pitt said "To ask people to accuse themselves and indict and convict themselves is silly. So why should that be required in proxy statements?" Such a disclosure statement, he continued "runs counter to what the Fifth Amendment is all about."

*national Controls Corp.*, 409 F.2d 937, 948 (2d Cir.1969). Although the prosecutor managed to incorporate the words "bribe", "bribery", and "slush fund" into every possible question, and prominently displayed one or more of these words in his blown-up summary charts, DeFalco testified that he neither heard nor used any of these words until they were spoken to him in the United States Attorneys Office in 1980, some two to three years after his alleged conversations with Matthews. Moreover, although it is undisputed that not a penny of bribe money was paid to anyone, the Government, even at this late date, argues that Matthews "never even asked the Board to approve the bribe, but instead misled it into believing that no bribe had been paid." Govt.'s Brief, 58. In the light of language such as this, the Government's contention appears to be that Matthews should have misled the Board into believing that a bribe had been paid. Indeed, although DeFalco, the Government's prime witness, testified that only $20,000 of Southland's money was to be used for bribing tax officials, the Government has argued repeatedly that the "truth" which Matthews assertedly held in his hand when he reported to the Board, was that $40,000 was to be spread among the members of the Tax Commission. After four years of grand jury hearings and two lengthy trials, the Government still has failed to establish what "truth" Matthews should have disclosed to Southland's Board and shareholders concerning the payment of bribes.

Although Matthews hardly could have confessed to membership in a phantom conspiracy, the Government is equally vague concerning whom Matthews should have identified as his co-conspirators. The SEC disapproves of attacks on character without complete and adequate supporting data, the Commission's position being that such attacks are contrary to the standards of fair disclosure unless they are in fact true. II Loss, *Securities Regulation* 913 (1961). In a note to Rule 14a–9, 17 C.F.R. § 240.14a–9, the Commission describes as examples of misleading statements under that section:

Material which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation.

The courts agree. *See, e.g., Kass v. Arden-Mayfair, Inc.*, 431 F.Supp. 1037, 1045 (C.D.Calif.1977) ("[A] 'puffed-up' accusation may constitute the presentation of an untrue statement.").

During the trial, the prosecutor stated categorically that Michael Davis was a co-conspirator. The district court later charged as a matter of law that Davis was not. The Government indicted and tried S. Richmond Dole for conspiracy; he was acquitted. In response to Matthews' inquiries, Mastropieri denied all wrongdoing. Should Matthews, proceeding "without factual foundation" and in complete disregard of the laws of libel and slander, have accused these men of conspiracy? The Government doesn't say. The Government likewise makes no mention of the furor that would have resulted had Matthews "impugn[ed]" the "character, integrity or personal reputation" of the members of the New York State Tax Commission by falsely stating that one of them had received a bribe of $5,000 and that $35,000 more was to be spread among the other Commission members. *See* Note, *Disclosure of Payments to Foreign Government Officials Under the Securities Acts*, 89 Harv.L.Rev. 1848, 1870 (1976) ("The State Department has warned that uncorroborated allegations that foreign officials have accepted improper payments have done grave harm to American foreign relations.").

■ The issue with the most far-reaching implications in the field of federal securities law, however, is not what "true" facts Matthews should have disclosed, but whether section 14(a) of the Exchange Act and the SEC rules enacted pursuant thereto required Matthews to state to all the world that he was guilty of the uncharged crime of conspiracy. This query, we are

satisfied, must be answered in the negative.

When Congress created the SEC in the 1934 Exchange Act, it was its intention to give the Commission "complete discretion ... to require in corporate reports only such information as it deems necessary or appropriate in the public interest or to protect investors." S.Rep. No. 792, 73d Cong., 2d Sess. 5 (1934), *quoted in Natural Resources Defense Council, Inc. v. SEC, supra,* 606 F.2d at 1051. Although we have held in a number of civil cases that Schedule 14A sets only minimum disclosure standards and that compliance with this Schedule does not guarantee that a proxy statement contains no false or misleading statements, *Maldonado v. Flynn,* 597 F.2d 789, 796 n. 9 (2d Cir.1979), a discussion of criminal liability should begin at least with the rules and regulations that the Commission has enacted. *See* Herlands, *Criminal Law Aspects of the Securities Exchange Act of 1934,* 21 Va.L.Rev. 139, 140 (1934). Schedule 14A provides us "with the Commission's expert view of the types of involvement in legal proceedings that are most likely to be matters of concern to shareholders in a proxy contest." *GAF Corp. v. Heyman,* 724 F.2d 727, 739 (2d Cir.1983). We take cognizance of this "expert view" as disclosed in the Commission's Rules, knowing that it was arrived at in general compliance with the provisions of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.,* and only after every feasible effort has been made to secure the views of persons to be affected. III Loss, *Securities Regulation* 1936–44 (1961); *see Natural Resources Defense Council, Inc. v. SEC, supra,* 606 F.2d at 1036–42.

The provisions of Item 6 of Schedule 14A, which require disclosure of only criminal convictions or pending criminal proceedings, were proposed in 1976, Securities Act Release No. 5758 [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 80,783 and adopted in 1978, Securities Act Release No. 5949 [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 81,649. In adopting the specifically articulated disclosure provisions of Item 6, the Commission said:

> Because information reflecting on management ability and integrity is, in part, subjective, it is difficult to articulate a meaningful, well-functioning objective disclosure requirement which will elicit it. The Commission believes that the categories of information about officers' and directors' involvement in litigation proposed in Release 5758 are material to investors. They represent factual indicia of past management performance in areas of investor concern.

Securities Act Release No. 5949, *supra,* at p. 80,618.

It is significant that, although the Commission gave consideration to amending Schedule 14A so as to require disclosure of questionable or illegal payments, *see* Securities Exchange Act Release No. 13185 [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 80,896 at 87,382–84, it did so knowing that this area is "difficult and complex", and it failed to adopt the proposals. *See* Securities Exchange Act Release No. 15570 [1979 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 81,959 at 81,392 n. 3.

Attempts to enlarge upon the disclosure requirements of Schedule 14A "provoked enormous disagreement ... among respected practitioners"[5] and were described by various commentators as controversial,[6] unclear,[7] fuzzy,[8] and inconsistent.[9] This

---

**5.** Speech by John M. Fedders at ABA Committee meeting on *Failure to Disclose Illegal Conduct, reprinted in* 14 Sec.Reg. & L.Rep. (BNA) 2057 (November 26, 1982).

**6.** Note, *Disclosure of Corporate Payments and Practices: Conduct Regulation Through the Federal Securities Laws,* 43 Brooklyn L.Rev. 681 (1977).

**7.** Branch and Rubright, *Integrity of Management Disclosures Under the Federal Securities Laws,* 37 Bus.Law. 1447, 1451 n. 16 (1982).

**8.** Schorr, *SEC's Fuzziness On What Illicit Dealings Should Be Reported Limits Disclosure,* Wall St.J., March 29, 1976, at 26, col. 1.

**9.** Ferrara, Starr and Steinberg, *Disclosure of Information Bearing on Management Integrity and Competency,* 76 Nw.U.L.Rev. 555, 564 (1981).

controversy and uncertainty resulted in large measure from the Commission's attempts to respond to the post-Watergate demand for complete ethical and social disclosure. After the administrative euphoria resulting from the voluntary soul-searching by over 450 companies had dissipated, the Commission again was faced with the difficult and complex problem of whether and how to compel so-called "qualitative" proxy statement disclosures concerning management ethics and integrity that were not specifically required in Schedule 14A. The Commission had not solved that problem when Southland's 1981 Proxy Statement was mailed. In 1981 the Commission itself described the law concerning disclosure of unadjudicated allegations as "unclear". *See* Sec. Act Rel. No. 82–19 (March 5, 1982), *quoted in Integrity of Management Disclosures, supra,* at 1477 n. 118. In his speech at the American Bar Association, *supra,* n. 6, Mr. Fedders said:

> The Commission has not promulgated specific disclosure requirements relating to all qualitative conduct, or, to the extent necessary, articulated a policy for law enforcement when information about such conduct has not been disclosed. The full extent of the obligation to disclose such information is uncertain in light of existing cases. In this limited area, there is little guidance for issuers or practitioners for resolving materiality and disclosure problems.

We deem it significant that those courts which have spoken in this area in the years following Matthews' asserted violations almost universally have rejected efforts to require that management make qualitative disclosures that were not at least implicit in the Commission's rules. In *Maldonado v. Flynn, supra,* 597 F.2d at 796, this Court stated that section 14(a) and Rule 14a–9 should not be used "as an avenue for access to the federal courts in order to redress alleged mismanagement or breach of fiduciary duty on the part of corporate executives." We stated further that "[e]fforts to dress up claims of the latter type in a § 14(a) suit of clothes have consistently been rejected", and we cited as

illustrative *Levy v. Johnson* [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,899 (S.D.N.Y.1977) and *Limmer v. GTE* [1977–78 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 96,111 (S.D.N.Y.1977), both of which involved illegal payments. *Id.* We found merit in the plaintiff's claim of wrongdoing only insofar as it alleged self-dealing by the defendant directors, a matter "explicitly covered by SEC disclosure regulations." *Id. See, e.g.,* Item 404(a)(2) of Regulation S–K, 17 C.F.R. § 229.-404(a)(2).

In *Weisberg v. Coastal States Gas Corp.,* 609 F.2d 650 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980), we again recognized the danger of expanding section 14(a) to encompass allegations of corporate waste but upheld a complaint which alleged bribes and kickbacks to the defendant directors. *Id.* at 655. In *GAF Corp. v. Heyman, supra,* 724 F.2d 727, a case involving the failure to disclose a pending action against a directorship candidate in a matter that did not involve GAF, we again emphasized that the Commission's Rules do not require a candidate for election to accuse himself of antisocial or illegal activities. *Id.* at 740.

The Ninth Circuit is in accord. In *Gaines v. Haughton,* 645 F.2d 761, 779 (9th Cir.1981), *cert. denied,* 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982), the Court stated:

> Absent credible allegations of self-dealing by the directors or dishonesty or deceit which inures to the direct, personal benefit of the directors—a fact that demonstrates a betrayal of trust to the corporation and shareholders and the director's essential unfitness for corporate stewardship—we hold that director misconduct of the type traditionally regulated by state corporate law need not be disclosed in proxy solicitations for director elections. This type of mismanagement, unadorned by self-dealing, is simply not material or otherwise within the ambit of the federal securities laws.

A number of lower courts have taken the same position. *See, e.g., Amalgamated Clothing & Textile Workers Union v. J.P. Stevens & Co.*, 475 F.Supp. 328, 331–32 (S.D.N.Y.1979), *vacated as moot*, 638 F.2d 7 (2d Cir.1980); *Lewis v. Valley*, 476 F.Supp. 62, 66 (S.D.N.Y.1979); *Bank & Trust Co. of Old York Road v. Hankin*, 552 F.Supp. 1330, 1335–36 (E.D.Pa.1982).

The Government has treated the instant case from the outset as one involving the withholding of qualitative rather than quantitative information. Government counsel conceded at oral argument that the Government had not proven that Matthews' actions had any adverse quantitative economic impact on Southland. Echoing the words of the district court, counsel contended that "[t]his was not a matter of dollars and cents, it was morality looked at through the eyeglasses of someone with economic interest." We are satisfied, however, that Matthews was not legally required to confess that he was guilty of an uncharged crime in order that Southland's shareholders could determine the morality of his conduct.

■ We hold that at least so long as uncharged criminal conduct is not required to be disclosed by any rule lawfully promulgated by the SEC, nondisclosure of such conduct cannot be the basis of a criminal prosecution. Our unwillingness to permit section 14(a) to be used as expansively as the Government has done in this case rests not only on the history of the Commission's approach to the problem of qualitative disclosures and the case law that has developed on this subject but also on the obvious due process implications that would arise from permitting a conviction to stand in the absence of clearer notice as to what disclosures are required in this uncertain area.

■ When a person of ordinary intelligence has not received fair notice that his contemplated conduct is forbidden, prosecution for such conduct deprives him of due process. *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954); *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939). Four lawyers, including a Pro-

fessor of Federal Regulation of Securities at a prominent law school, a former Chairman of the Committee on Professional Responsibility and Liability of the ABA Section on Corporation, Banking and Business Law, and a former SEC Commissioner and Chairman of the Executive Committee of the ABA Committee on Regulation of Securities, submitted affidavits in support of Matthews' pretrial motion to dismiss, asserting the lack of any precedent for the Government's theory of liability. Professor Alan R. Bromberg, an acknowledged authority in the field of securities law, filed an amicus brief with this Court in which he stated that "this case goes beyond any precedent in requiring disclosure of unadjudicated and uncharged conduct relating to 'management integrity' ". See also the reaction of knowledgeable authorities to this very lawsuit quoted in footnote 4, *supra*. We agree with these observations. Constitutional issues aside, changes in the interpretations of the Commission's rules should not be made in such a manner. *See Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1291–94 (2d Cir.1973); *Flynn v. Bass Brothers Enterprises, Inc.*, 744 F.2d 978, 988 (3d Cir.1984).

Our rejection of criminal liability for nondisclosure of uncharged criminal conduct is also buttressed by concerns about the self-incrimination implications of accepting the Government's approach. In assessing these concerns, we turn, as this Court has before, to the plurality opinion of Chief Justice Burger in *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), which upheld the validity of a California statute making it unlawful to leave the scene of an accident. In support of this holding, Chief Justice Burger emphasized the noncriminal and regulatory nature of the inquiry and the lack of substantial risk of incrimination. *Id.* at 427–31, 91 S.Ct. at 1537–39. In *SEC v. Radio Hill Mines Co.*, 479 F.2d 4 (2d Cir.1973), we upheld an order requiring the individual appellant to file with the SEC a record of his securities holdings and transactions. In so doing, we emphasized the "essentially noncriminal and regulatory area of inquiry" and the fact that such disclosure was not an admis-

sion of an "inherently suspect" activity. *Id.* at 7.

In *United States v. Dichne*, 612 F.2d 632 (2d Cir.1979), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980), we upheld the reporting requirements of the Bank Secrecy Act, then 31 U.S.C. § 1101, now in substance 31 U.S.C. § 5316, concluding that "the reporting requirement does not present such a 'substantial risk of incrimination' so [sic] as to outweigh the governmental interest in requiring such a disclosure." *Id.* at 641. In *United States v. Stirling*, 571 F.2d 708 (2d Cir.), *cert. denied*, 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978), appellants were accused of failing to disclose in a registration statement alleged favored treatment of union officials which might have violated the Taft-Hartley Act, 29 U.S.C. § 186. Once again, we held that the compelled disclosure would not be an admission of an inherently suspect activity, observing that appellants simply engaged in a lawful activity in an unlawful manner. *Id.* at 728.

In the instant case, Matthews was charged with failing to disclose far more than just an "inherently suspect" activity. The district court instructed the jury that "[t]he essence of the crime alleged in Count Two is that in proxy materials the defendant Matthews omitted to inform the shareholders of the Southland Corporation of his alleged prior participation in the bribery and tax conspiracy charged in Count One of the indictment. . . ." In view of the fact that a grand jury was actively investigating this very conspiracy when the proxy materials were issued, we do not understand the district court's holding that disclosure by Matthews of his participation in the conspiracy "[did] not pose a substantial possibility of incrimination", *United States v. Dole*, 601 F.Supp. 430, 433 (E.D.N.Y. 1984). *See, e.g., Grosso v. United States*, 390 U.S. 62, 66–67 (1968); *Carter-Wallace, Inc. v. Hartz Mountain Industries, Inc.*, 553 F.Supp. 45, 48–50 (S.D.N.Y.1982).

Were we to face the issue directly, we are not certain we would find persuasive

the argument that Matthews' self-incrimination privilege was not violated because he was not compelled to run for the office of director. Coercion associated with a person's livelihood, professional standing and reputation may, in some circumstances, be too powerful to ignore when Fifth Amendment rights are at issue. · *See Lefkowitz v. Cunningham*, 431 U.S. 801, 804–09, 97 S.Ct. 2132, 2135–38, 53 L.Ed.2d 1 (1977); *Lefkowitz v. Turley*, 414 U.S. 70, 78, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); *Garrity v. New Jersey*, 385 U.S. 493, 496–97, 87 S.Ct. 616, 618–19, 17 L.Ed.2d 562 (1967); *Spevack v. Klein*, 385 U.S. 511, 516, 87 S.Ct. 625, 628, 17 L.Ed.2d 574 (1967). *See also United States v. Kordel*, 397 U.S. 1, 13, 90 S.Ct. 763, 770, 25 L.Ed.2d 1 (1970) (incriminating evidence may not be coerced under penalty of either giving the evidence or suffering a forfeiture of property).

For all the reasons above discussed, the judgment of the district court is reversed, and the matter is remanded to the district court with instructions to dismiss the indictment.[10]

---

**10.** Because we are directing the dismissal of the indictment, we need not discuss whether Mat-

thews would be entitled to a new trial in any event because of the misconduct of a juror.